at all. Argument not to exceed 15 minutes per side. Mr. Curtright, you may proceed for the appellant when you're ready. Thank you. May it please the court, my name is Lance Curtright and I represent the appellant, Meridad Hosseini. I'd like to reserve three minutes for rebuttal. All right. Your honors, we have four points of argument on our brief, all of which merit your attention, but the heart of the case is that by distributing flyers about the Iranian government's corruption and its crackdowns on citizen-led protest, Hosseini did not knowingly provide material support to any foreign terrorist organization. Turning first to the issue on knowledge, the agency's decision that Mr. Hosseini did not lack knowledge about the F.E.K.'s and the M.E.K.'s terrorism was arbitrary and capricious. Mr. Hosseini said throughout these proceedings that he did not have knowledge about their activities. He said it first in his affidavit and he said it again in his response to the notice of intent to deny. The agency, notably, has nothing in the record that contradicts his statements. And that's the question. What was his state of mind? And nothing in the record suggests that he did have knowledge about these incidents. Did he realize or know that these were two organizations that had been designated as terrorist organizations during part of the time that he had some association with them? No, he did not. And also the organizations were never – When you say he did not, does that mean that the record doesn't address that issue? Well, it's a couple of things about your question. They were never actually designated by any department of state. They're considered undesignated terrorist organizations, which is part of what you have to decide is whether they're actually classified correctly. So he had no knowledge about their designation at any point in time because at the time when he was with them, they were not designated. Now, the MEK has a history where they were designated. I can't remember when, but I think it was after – far after his association with them. And then they were de-designated in 2012. But the question is whether he supported an undesignated group, which is defined as a group of two or more people who are engaged in terrorist activities. So what the court has to decide is whether the agency correctly found that these groups were engaged in terrorist activities at the time when he was supposedly supporting them. The record does not support the agency's conclusion that they did. But even if it did, he does not have knowledge about what they were doing at that time period. And I think that's dispositive in his favor. Again, he said so – You're saying he was handing out material on behalf of organizations that he didn't know what they did? That is correct. He did not know the full ambit of what they were doing. Remember, what he was – the flyers that he was actually distributing had nothing to do with terrorism and had nothing to do with violence. The flyers that he was distributing only coincided with his political opinion, which was in opposition to Iranian government's corruption and its crackdown on women's groups and student groups. So there was no flyers in this case that said, hey, this act of terrorism was fantastic. Let's support it. He didn't even know about that as far as the record goes as well. And that's what he said throughout. And the question for the court is what was his state of mind? But he has the burden to show that by clear and convincing evidence that he didn't know. That's the burden. That's a really high standard, isn't it? It is, but the agency didn't even apply that standard, Judge. The agency applied a public and shocking standard where they classified one incident that the agency or the group allegedly did and said it was so notorious that every person had to have knowledge about it. The problem with that test is that's not what Congress said. You stated it correctly. He can avoid inadmissibility if he could show by clear and convincing evidence that he did not know about their conduct. But if you just say something is public and shocking and impute knowledge, there's no engagement in that test at all. So why? I mean he says I didn't know they were a terrorist organization. The government says, look, in 1981 or whatever, there was this huge incident that everybody knew about or likely knew about. Now, maybe they did and maybe they didn't, but isn't it up to the decision-maker to weigh that and just say I don't think you met your burden of clear and convincing evidence and I'm going to go the government's way? Well, it is up to the decision-maker to weigh that, but they didn't weigh it. If you look at your decision in Danis Farber v. Ashcroft, the actual standard is the person's state of mind. Now, how they can understand what Mr. Hosseini's state of mind was without ever actually speaking to him in over 13 years is a mystery to me. And it's because it's the wrong standard. They asked for him to submit written statements, which he did on two occasions, and he denied knowledge. But they disregard those statements in favor of their public and shocking test. But that is not going to what he actually knew. In an interview, they could have asked him some questions. They could have probed into his knowledge. They could have asked him some clarification points to actually get to what the actual standard is, which is his state of mind. And that's this court's decision in Danis Farber v. Ashcroft. In that case, this court provided the agency a framework by which to decide the knowledge issue. In that case, the court was confronted with a young person who was like Hosseini, distributing flyers in opposition to the Iranian regime. But he was doing so on a little bit more intense basis. He was even on a panel, which decided what type of content to put in those flyers. But the court here in that case found that he lacked knowledge about the MEK's activities, in part because he was young and unsophisticated at the time. He was not involved in their violence, and he provided sworn testimony to that effect. That's exactly what you have here. Mr. Hosseini was young and unsophisticated. He has provided sworn statements that he did not have knowledge about what was happening with MEK's terrorism at the time. And that case is dispositive of this issue. And that's the legal standard which the agency is bound by law to apply. Mr. Hosseini – Did he say at one point that he had heard at least some rumors of the terrorist activity? There were some rumors of terrorist activity. That he had heard, right? That he had heard. That's in his affidavit. So if you think about that, if you look at the Seventh Circuit's case in Kahn v. Holder, the Seventh Circuit made a distinction between individual members of a terrorist organization committing an act versus the organization actually sanctioning it by its leaders. And the difference is key, because if individual members of a group commit an act of terrorism, that does not mean that a person would conclude that the entire group are terrorists. One of the cases I read said it would be like a member of the Republican or Democratic Party going out and committing an act of terror. No one would reasonably conclude that those parties are terrorist organizations. The MEK, similarly, was a political party in the 1980s after the revolution. And had Hosseini heard rumors about what they did, he would not necessarily conclude that whoever did that – But if the rumors were about the organization being involved in terrorist activity and he passes out the flyers anyway, I mean, isn't that problematic? I mean, I understand what you're saying. You're saying, well, what, he only heard rumors that some individual who was associated with that group was a terrorist, but had no reason to suspect that anybody else or that the group was? I think it would be problematic if it was in advancement of some type of terrorism. But remember, the flyers that he was distributing only coincided with his support of women's groups, student groups, and anti-opposition to Iran. These things were common in the community at that time, and this was the issue of the day. So he was finding these flyers that were getting to the truth of what was happening in Iran because the Iranian government at that time was actively squashing freedom of press. So what is the relevance, I suppose, of the content of the flyers then for us? It goes to his knowledge and what he actually knew. In other words, because the flyers he was passing out weren't like death to America or something, that therefore he didn't have any reason, it shows that he didn't think they were a terrorist group. It supports that opinion. I think one thing that really needs to be talked about is we're talking about the 1980s in Iran, right after the revolution. There's no Internet. There's no Twitter. And down as far as the court even found that the Iranian government was squashing the freedom of press, no one knew what was happening. So Mr. Hosseini as a young man was trying to get to the bottom of things, and he was reading flyers from multiple organizations and distributing flyers from multiple organizations, and he found what he was looking for, Iranian corruption, support of women's groups, support of student groups. And that's what he distributed. And that support, Judge, was not material. Congress provided a list of non-exhaustive lists, rather, of material support. It includes providing a safe house, transportation, money, false documentation, or weapons training. In other words, conduct that is far more serious than what Mr. Hosseini did when he made some copies and sent some faxes on a minimal and occasional basis. In fact, before the district court's ruling, I was unable to find any federal court that had such an expansive and breathtaking definition of material support. But that's not the court, right? That's the government is taking that position, right? I mean, what is the deference that we owe to the agency's construction of material support and what it means? Well, the USCIS, it's kind of interesting because you have a USCIS decision here, and then you have a Board of Immigration Appeals decision. I think you deserve, they deserve, neither deserve any deference, but especially the agency decision. It's not a precedent decision. So they legally get no deference? I think no deference. They don't get Skidmore, Chevron, Moorock, Dower, I mean, any of them. Well, as an unprecedented decision, I believe they get a reasonable test. It would be, I think, I haven't really thought about that a whole lot, but the deference would be a minimal form because there's no precedent here at all. And it shouldn't be that much deference either, if you look at some of the other federal courts have actually looked at what materiality means. In Kahn v. Holder, the Seventh Circuit said it was distributing flyers plus writing articles and attending meetings. In Bonginardi v. Holder, the Ninth Circuit said it was distributing flyers plus writing articles and training MEK members on the use of guns. And De Amaldo v. Holder, the Fourth Circuit said it was hanging posters plus paying a membership fee every month for four years. All of that is conduct that far exceeds Mr. Hosseini's. No court has found, like the lower court did and the agency did, that the mere participation in the political process of a foreign country by distributing flyers about— But for six years, right? I mean, it's not like he did it for two months or something and then said, I'm out of here. But it was on a minimal and occasional basis. That's what the record says. So even if it was over a six-year period of time, it wasn't all the time. He was printing them himself, right? I mean, he was getting a template from somebody. He was producing them in his house or whatever and taking— I mean, he was showing more initiative than just, hey, why don't you pass these out every six months or something. I don't know if the record supports that. I do think that the record supports that he was in opposition to the Iranian regime like our own country and especially how it cracks down on students and women's groups. So when those things corresponded, yes, I think he was active in that. But that doesn't mean that he was supporting one of the groups. Remember, all this information was in the public sphere. Everybody was out there, a lot of everybody. A lot of people were out there distributing this type of information because that was the issue of the time. What would you say about the Supreme Court's case, Holder v. Humanitarian Project, that seems to suggest that if support is provided that lends legitimacy to a terrorist organization, then there might be a carve-out for some political activity, but even handing out material promoting the organization might come within the ambit of lending legitimacy? I think—may I answer your question? Sure. The Holder case was a challenge to a criminal statute, and that statute was specifically addressing designated terrorist groups. So there was no ambiguity or any type of concern about who these people were actually going to go and support. The difference, I think, here is we're a civil statute. We're talking about things that happened 30 to 40 years ago with groups that at the time were never designated by Congress to actually be terrorist groups. And you're talking about behavior that was nonviolent and purely political, and it's important. But what about Judge Clay's, I think, question? What about the material support part of Holder? Isn't there a broad definition in that case of material support, and there's a carve-out in that statute that we don't have in the statute in front of us, right, for political activity or whatever it is? I mean, doesn't that suggest that that is covered if it's not carved out? Well, I think it is. Holder, if it's relevant, has the test, and it says that material, the word, has to mean something. Otherwise, it's surplusage. And what it means in Holder is that it frees up the terrorist group's people to do other acts of terror. So the question for the court is looking at Mr. Hosseini. By making some copies and sending some faxes on a minimal, occasional basis, did he free up the organization to commit acts of terror? And nothing in the record supports that he did, because the information that he was distributing was already in the public sphere, and there were already people out there distributing it. If he hadn't have done it, other people would have. Thank you. Thank you. You're from the government. Good morning. Good morning, Your Honor. If it pleases the Court, Joseph Crillay for the appellee's defendants. The Court should uphold the district court's decision to deny Hosseini's motion for summary judgment. United States Citizen Immigration Service's decision to deny his petition to adjust status was not arbitrary and capricious. First, the decision to grant Mr. Hosseini derivative asylee status is different than the decision to grant Mr. Hosseini adjustment of status. Second, the record clearly shows that the MEK and the FEK were undesignated terrorist organizations. Third, that Mr. Hosseini did not present clear and convincing evidence that he lacked knowledge of the terrorist activities. And finally, that he provided material support to the MEK and the FEK. Addressing my first point, let's just be clear that collateral estoppel does not apply to Citizenship and Immigration Services decisions. Mr. Hosseini posits that at the time he was granted derivative asylee status, that that should then bind Citizenship and Immigration Services in making any other decisions on any other immigration benefits. First, these are two separate decisions. Second, the law changed between when he was granted derivative asylee status and when he petitioned for adjustment of status. And third, there was a more complete record because the government had received additional information from Mr. Hosseini about his activities with both the MEK and the FEK when it came time to make his adjustment of status decision. What information, I'm sorry. Counsel, I guess the record shows that the petitioner left off his first application for adjustment for lawful permanent residency. The fact that he has some connection with one of these organizations. How did that weigh, if at all, in the decision to deny him? As far as? In terms of his credibility when he claimed he didn't have substantial, I guess, association with these alleged terrorist organizations. The agency, in considering the information about his activities with the MEK and the FEK, were in determining whether or not he was inadmissible under a terrorism-related immigration, terrorism-related ground, not under any other grounds of inadmissibility. In other words, that he had committed fraud or had attempted to conceal something from the agency. It was just that we now have a fuller picture and we now understand your affiliation both with the MEK and your affiliation with the FEK and whether or not your affiliation, your activities, your material support would render you inadmissible under a terrorism-related ground. All right. It's clear from the record that the MEK and the FEK were undesignated terrorist organizations. What's the evidence that he knew, though? How did he – did he know that? Well, the lack of knowledge standard, there are two parts to it. It's that the individual did not know and that he should not have reasonably known that the organization was a terrorist organization. So you're going on the objective prong here? I think that there is both evidence for the subjective prong and the objective prong. Mr. Hussaini – in the record supports that Mr. Hussaini took the time, he looked and reviewed at the activities of these organizations. And he doesn't – also in the record shows that he doesn't contest that the FEK was in fact conducting terrorist activities. If you look at the subjective prong, you look at the open and notorious nature and the activities that both of these organizations were engaging in. And I think the record is clear that the MEK for a long period of time was engaged in terrorist activities and the FEK too was for an extensive period of time was engaged in it. Now, I think that this well-reported sort of activities again shows his – that he should have known. But he also indicates that he did know. He attempts to discredit his own knowledge in the record by saying, well, that information wasn't reliable. I thought I heard some stuff about their activities, but you really couldn't trust any information that was in the public domain at that point in time. But again, at the same time, he's saying in the record that he took the time to learn and he read about these organizations. And after the 1979 overthrow of the Shah, he took time to try to learn about what was going on in Iran and what the government was doing and what activities were occurring. And so I think that the record shows that he has not demonstrated by clear and convincing evidence that he didn't know or shouldn't have known that these were terrorist organizations. I think opposing counsel points to Dhanushar, which is a Sixth Circuit case. I just want to point out in the first instance with that case, that case was decided before the Real ID Act. And that's important because the Real ID Act, although maybe not affecting the test that is applied for lack of knowledge, the Real ID Act changed the knowledge prong. And so in Dhanushar, the standard that was applied was that the individual did not know or should not have reasonably have known that the solicitation would further the organization's terrorist activity. That is very different from what the Real ID Act requires and what the agency evaluated Mr. Husseini's conduct under is to demonstrate by clear and convincing evidence that he did not know or should not have known that the organization was a terrorist organization. And when you look at the prongs of the Dhanushar test, I think it's clear that he didn't meet, he didn't demonstrate by clear and convincing evidence that he lacked knowledge. Now I would also point to the last portion, which is that he did provide material support to this organization. In discussing his activities with the MEK, what the record indicates, and this is coming from his wife's affidavit. Do you have an answer on the question about, are we deferring to anybody on the meaning of the statute? We should defer to the agency's interpretation and the agency's application of the statute. So what standard are we using? We've got arbitrary and capricious for the ultimate decision. What about the construction of the words though? I think that the agency should be given some deference, I don't believe it, on the application of the statute and their decisions as to what is or is not a Tier 3 undesignated organization. I think that Congress has made it clear by the language of the statute that they have given the executive the ability to make that individual determination when evaluating an individual's adjustment of status thing. I know that appellant points to that citizenship and immigration services merely is out there just to divvy out immigration benefits, and that's not true. They have the authority under the statute that's been given in the Congress to make these types of determinations. So the USCIS gets some deference? They should get deference, yes. Do we know why? Skidmore, our... I'm not... Okay, that's fine, go ahead. Sorry. And the last is that he did provide material support to this organization. In his wife's, her affidavit supporting her asylum application. Do you agree this case is really not like any of the others? I mean, this is close to the edge, right? Isn't counsel right? I mean, usually when you're passing things out or whatever, there's something else that the person is doing in these other cases. I think that... They're not solely passing out flyers. I mean, this guy is, that's the only thing he's doing. And are there any cases where that's the only thing somebody's doing? I think what I would point to is, cited in the 28-J letter that the government submitted in the ACM, they do point to, and this is a Second Circuit case, which talks about designing and printing communications materials such as brochures, posters, and banners. And this is Tahir Aviv's lynch, where it is that level of activity. And as far as this being on the edge, I mean, we have... This is... He is handing out propaganda on behalf of organizations that are undesignated terrorist organizations. Courts have found that it doesn't matter if your activities are solely in the realm of the sort of non-terror related, that that still is material support. And we have to take into account that this is propaganda that he's passing out. This is, in some degree, supporting the goals of the organization, which is to overthrow the government of Iran. And both of these organizations were attempting to overthrow the government of Iran through violent means. By promoting women's rights and students' groups. Well, that's... I mean, that is what he indicates that the flyers are passing out. But again, it's on behalf of, and it's contrary in saying, this government should not be in power and that this government should be overthrown because they are not... We don't have any of the flyers in the record. No, we do not have any flyers in the record. I mean, I think that we have other cases that deal specifically with providing glasses of water or providing food. And that is material support to a terrorist organization. To say that passing out flyers on behalf of that organization wouldn't then also be material support, I think is... Couldn't you draw... You could draw a line, a defensible line between providing tangible things versus passing out flyers, right? Guns, water, whatever it is. I mean, it seems to me that if you wanted to draw that line, you could. It wouldn't be ridiculous. But I don't think Congress doesn't draw that line and the statute doesn't draw that line. Material support is a support to the terrorist organization. Someone passing out flyers helps free up someone to do something else. Passing out flyers helps further the terrorist goals. It helps further recruitment. I mean, to say that I think that this would go to... Maybe the court wants to draw the statute of someone today. Today, well, they only designed the webpage for ISIS, and therefore that's not material support to ISIS. Or they only handed out flyers saying that the West is bad because they don't do certain things. Or Western or ex-government doesn't provide these types of things to its citizens. And I think that that is not a distinction that's drawn in the statute, and it's not a distinction that Congress intended. And it is not the way that the board has—the Board of Immigration Appeals, North Citizenship and Immigration Services—has interpreted material support to me. What's the relevance of the older humanitarian case? I think that the relevance of the case is that what material support means, that it doesn't need to both further the— It is there that if someone is—material support is something that is important. And something is material if it then frees up resources to do other—the group to do other things. And then it frees up the activities of the organization, other individuals to take part in other activities. And I think it takes into account—what's important about the whole decision, I think it takes into account what a modern terrorist organization looks like. That it has various, say, groups or portions of it that deal specifically with maybe violent activities, nonviolent activities. But it's all in furtherance of the goals of the terrorist organization, and it all must be completed. Unless the court has any other questions. Apparently not. I mean, the court should uphold the district court's decision to deny his motion for summary judgment. I think that the record clearly shows that the MEK and the FUK were undesignated terrorist organizations. That Mr. Husseini provided material support to those organizations. And at the time he provided material support, those organizations were undesignated terrorist organizations. And because the record supports that, and there is a rational connection between what the record supports and CIS's decision that he should be denied adjustment of status, that their decision to deny his adjustment of status was not arbitrary and capricious. Thank you. Thank you. The government's position in this case gives the word material no effect whatsoever. And this court cannot abide by that because material is in the statute. It has to have some meaning. The Board of Immigration Appeals, in its most recent unpublished decision, which I provided the court in my 28-J letter, a matter of SR, dealt with a person who was enslaved by a terrorist organization. And he took water from a common well and provided it to his fellow slaves. The board in that case said that that was not material support because the actions were too attenuated to the goals of any terrorism. Well, Mr. Husseini took ideas and knowledge that were in the public sphere, just like water from a common well, and he distributed it to his fellow citizens who were oppressed by the Iranians, just like the person who was enslaved in Sri Lanka. That's not material support because it's too attenuated to any of the acts of terror. And that actually gives the word material some effect. Again, in Holder, they said you had to have actions that freed up the organization to commit acts of terrorism. Nothing in this record, and USCS didn't even make a finding to this effect, said that his actions of distributing flyers and making some facsimiles freed up the MEK and the FK. This court should not presume that. Well, if he was disseminating political propaganda and we immediately don't have the flyers, if that was the content of what he was doing, there is at least an argument that that would constitute material support. But the issue is, does it free up the age of the group to commit acts of terrorism? And because other people were doing it, and these things are already in the public sphere. Is that exclusive, though? I mean, why do you say that? I mean, if he's passing out information that furthers the goal of the organization, whether they would have paid somebody else to do it or not, why is that not lending material support to the organization? Well, if he was doing something directly at their orders, that might be different. But he was not. He was only distributing flyers that were coinciding with his political opinion. So I think that would be a difference. He was actually directly aligned with them. But he was a person who was opposed to the Iranian government's corruption and its crackdowns on its citizens. And what did he do about it? Well, he read about it and he distributed some flyers. Occasionally, not every time, the flyers came from these groups that incidentally were involved in terrorism. But he didn't know about that. And USCIS never bothered in the 13 years that it considered his case and thought he was involved in terrorism to bring him into one of their offices to ask him, where are those flyers? What about this group? How did you not know about it? They never made that determination, and that's a violation of the Administrative Procedures Act. And therefore, this court should overturn the lower court's decision. Thank you. Thank you very much. And the case is submitted.